UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
In the matter of the complaint of MICHELE A.    :
D'ANCONA, *as Executrix of the Estate of Peter*    :
*Rocco D'Ancona and Talkin' Trash, bearing NY*    :
*7257 GY,*    :
     :
For Exoneration From Or Limitation Of Liability    :
     :
-------------------------------------------------------------- x

**REPORT AND
RECOMMENDATION**

19 Civ. 5492 (EK) (VMS)

**Scanlon, Vera M., United States Magistrate Judge:**

Before this Court on referral from the Honorable Eric R. Komitee, United States District

Judge, is the motion of Petitioner Michele A. D'Ancona, as Executrix of the Estate of Peter

Rocco D'Ancona and Talkin' Trash, bearing NY 7257 GY (the "D'Ancona Estate") for

summary judgment pursuant to Federal Rule of Civil Procedure 56. See ECF Nos. 67–70.

Claimants Town and Country Marina Corp. and Vic's Marina East Inc. (together, "Town &

Country") opposed the motion. See ECF Nos. 71–73. Petitioner replied. See ECF No. 74. At

the Court's request, the parties submitted additional briefing as to whether this Court has

admiralty jurisdiction over this action. See ECF Nos. 75–76. For the following reasons, this

Court respectfully recommends that the District Court dismiss this case for lack of admiralty

jurisdiction under 28 U.S.C. § 1333 and dissolve the stay entered at ECF No. 38. If the District

Court finds that it has admiralty jurisdiction, this Court respectfully recommends that the District

Court grant the D'Ancona Estate's motion for summary judgment and deny Town & Country's

claims for contribution and indemnification under maritime law within the limitation and

exoneration action.

## I. Background

The Court assumes the parties' familiarity with the underlying facts and recounts only those facts pertinent to resolving the instant motion.[1]  Until his death, Mr. D'Ancona was the owner of the vessel "Talkin Trash," documented as NY 7257 GY[2] (the "Vessel").  Compl. (ECF No. 1) ¶ 5.  From June 30, 2018 to July 1, 2018, the Vessel was docked at Slip 4 at Cherry's Bar[3] in Fire Island, New York.  Id. ¶ 7.  During that time, Mr. D'Ancona and Clemendina Sgambati died as a result of carbon monoxide poisoning while aboard the Vessel.  Id. ¶ 11.

The D'Ancona Estate commenced an action against Town & Country in state court asserting negligence and wrongful death claims (the "D'Ancona State Action").  See Compl., D'Ancona v. Town and Country Marina Corp., et al., No. 600897/2019 (N.Y. Sup. Ct. Jan. 14, 2019) ("D'Ancona Complaint").[4]  On August 8, 2019, Anthony R. Sgambati, as Executor of the Estate of Ms. Sgambati (the "Sgambati Estate"), commenced action against Town & Country and the D'Ancona Estate in state court asserting common law claims, including a wrongful death claim (the "Sgambati Action").  See Compl., Sgambati v. Town and Country Marina Corp., et al., No. 615452/2019 (N.Y. Sup. Ct. Aug. 8, 2019) ("Sgambati Complaint").

The Sgambati Complaint alleges the following: Prior to July 1, 2018, Town & Country took possession of the Vessel for the purpose of conducting repairs.  See id. ¶¶ 22–26.  Town &

---

[1] A detailed recitation of the background of this matter and the related actions may be found in this Court's Memorandum and Order dated August 28, 2020, at ECF No. 38.

[2] The Complaint incorrectly identifies the Vessel's registration number as "NY 7257G4."  See Order dated 7/20/2021.

[3] Cherry's Bar is part of a business called "Cherry's On The Bay."  See https://cherrysonthebay.com/contact.html (last visited Jan. 24, 2023).

[4] The state court documents are available online via the New York State Courts Electronic Filing (NYSCEF) website, https://iapps.courts.state.ny.us/nyscef/HomePage (last visited Jan. 24, 2023).

Country "assembled and/or disassembled hoses connected to the generator located in the engine compartment" of the Vessel, and "the function of such hoses was to permit carbon monoxide to be expelled from the generator out of and away from the cabin and living quarters onboard" the Vessel. Id. ¶¶ 28–29. In the course of performing that work, Town & Country caused the hose to "crack and/or break thus allowing carbon monoxide to escape therefrom and accumulate in the engine compartment and to migrate to the cabin and living quarters thereof." Id. ¶¶ 30–31. Both Town & Country and D'Ancona, despite knowing of the defect, failed to take corrective action and/or advise Sgambati of the dangerous condition. Id. ¶¶ 35–36. The decedents died due to inhaling carbon monoxide that was allowed to "migrate into the cabin area and living quarters thereof due to the aforementioned broken and/or cracked hose." Id. ¶ 39. The complaint alleges that Sgambati's death was due "solely and wholly" due to the negligent acts of D'Ancona and Town & Country. Id. ¶ 52.

On September 27, 2019, the D'Ancona Estate brought this action seeking limitation of, or exoneration from, vessel owner liability pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30501–30512. The D'Ancona Estate moved to stay the Sgambati Action and the D'Ancona State Action pending the outcome of this limitation and exoneration action. See ECF No. 8. By Order dated August 28, 2020, this Court granted the motion to stay as to all claims against the D'Ancona Estate in the Sgambati Action, denied the motion as to the remaining claims against non-vessel owners in the Sgambati Action, and denied the motion as to the D'Ancona State Action. See ECF No. 38.

The D'Ancona Estate later settled with the Sgambati Estate, and the Sgambati Estate's claims against the D'Ancona Estate were dismissed with prejudice. See ECF No. 55; 11/19/2021 Order.

3

The D'Ancona State Action has proceeded in state court, and the parties have filed a note of issue.  See Note of Issue, D'Ancona v. Town and Country Marina Corp., et al., No. 600897/2019 (N.Y. Sup. Ct. Dec. 1, 2022).[5]

## II.  Legal Standards

### a.  Summary Judgment

"Summary judgment is available in maritime limitation-of-liability proceedings."  In re Treanor, 144 F. Supp. 3d 381, 387 (E.D.N.Y. 2015).  Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).  "It is the movant's burden to show that no genuine factual dispute exists," and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor."  Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the movant has met its burden, its opponent must "do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial."  Exp.-Imp. Bank of U.S. v. Agricola Del Mar BCS, 334 F. App'x 353, 354 (2d Cir. 2009) (citation omitted).

---

[5] Available on NYSCEF, https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex= vbFRdttPTGcOYZvYpEQkDQ== (last visited Jan. 24, 2023).

The non-movant may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Fed. Trade Comm'n v. Moses, 913 F.3d 297, 305 (2d Cir. 2019) (citation omitted).  "Something more than a fanciful allegation is required to justify denying a motion for summary judgment when the moving party has met its burden of demonstrating the absence of any genuine issue of material fact." Gordon v. Gen. Prop. Mgmt. Assocs., Inc., 496 F. Supp. 3d 830, 835 (S.D.N.Y. 2020) (quoting Contemporary Mission v. United States Postal Serv., 648 F.2d 97, 107 (2d Cir. 1981)).  "A 'bare assertion' that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f). Contemporary Mission, 648 F.2d at 107.  A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Simpson v. City of N.Y., 793 F.3d 259, 265 (2d Cir. 2015).

### b.  Admiralty Jurisdiction And The Application of Maritime Law

"Although the Limitation of Liability Act provides a federal cause of action for a vessel owner seeking exoneration or limitation, it does not provide an independent foundation for federal admiralty jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 244 (2d Cir. 2014) (internal quotation marks omitted).  "Instead, the district court will only have admiralty jurisdiction to hear a petition for limitation if it already has admiralty jurisdiction over the underlying claims that the petition seeks to limit." Id.  To determine whether admiralty jurisdiction exists over an alleged tort, courts apply the test the Supreme Court established in Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 115 S. Ct. 1043 (1995).  The Grubart test includes a "location test" and a two-part "connection test." Tandon, 752 F.3d at 248.

### i. Location Test

A court applying Grubart's location test "must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." Grubart, 513 U.S. at 534.  The location test is satisfied where the incident takes place on a vessel docked on navigable waters.  See Sisson v. Ruby, 497 U.S. 358, 361 (1990) (finding that a ship docked at a shipyard satisfies the location test); Vasquez v. GMD Shipyard Corp., 582 F.3d 293, 299 (2d Cir. 2009) (observing that a ship docked for repairs is "still in 'navigable waters' for purposes of federal admiralty jurisdiction").  "Pursuant to the locality test, the tort occurs where the alleged negligence took effect, rather than where the negligent act was committed." Dolan Bros. Shellfish Co. v. Boissoneault, No. 3:05 Civ. 1385 (WWE), 2007 WL 963203, at *2 (D. Conn. Mar. 29, 2007); see Taghadomi v. United States, 401 F.3d 1080, 1084 (9th Cir. 2005) (location test is based on "the place where the injury occurs").  "[W]here the negligent act originates on land and the damage occurs on water, the cause of action is within the admiralty jurisdiction." Kelly v. United States, 531 F.2d 1144, 1146 (2d Cir. 1976) (quoting In re Motor Ship Pacific Carrier, 489 F.2d 152, 157 (5th Cir. 1974)); see Smith v. Pan Air Corp., 684 F.2d 1102, 1111 (5th Cir. 1982) ("[A]dmiralty jurisdiction has repeatedly been extended to cases in which death or injury occurred on navigable waters even though the wrongful act occurred on land."); Pritt v. Air & Liquid Sys. Corp., No. 19 Civ. 10651 (KPF), 2022 WL 902684, at *11 (S.D.N.Y. Mar. 28, 2022) ("Plaintiff's alleged asbestos exposure during this period satisfies the location test because the exposure occurred while the [vessel] was either at sea or dry-docked for repairs at the Brooklyn Naval Shipyard.").

### ii. Connection Test

To apply <u>Grubart</u>'s connection test, a court must first "assess the general features of the type of incident involved, to determine whether the incident has a potentially disruptive impact on maritime commerce," and second, "determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." <u>Grubart</u>, 513 U.S. at 534 (internal quotation marks & citations omitted).  "The first part of the connection test looks to the nature of the incident that immediately caused the underlying injury; the second part, by contrast, looks to the nature of the broader activity giving rise to that incident." <u>Germain v. Ficarra (In re Germain)</u>, 824 F.3d 258, 270 (2d Cir. 2016) (quoting <u>Tandon</u>, 752 F.3d at 250–51).  The second part—the substantial relationship test—is satisfied "when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." <u>Grubart</u>, 513 U.S at 541.

As to the first part of the connection test, courts look to the "potential effects, not to the particular facts of the incident" to determine whether the incident is likely to disrupt maritime commerce.  <u>Grubart</u>, 513 U.S. at 538 (internal quotation marks omitted).  The "'inquiry does not turn on the actual effects on maritime commerce' of a particular incident; '[r]ather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity.'"  <u>Germain</u>, 824 F.3d at 267 (quoting <u>Sisson</u>, 497 U.S. at 363).  "[T]he focus under the first prong of the modern test is on capturing possible effects of similar incidents on maritime commerce."  <u>Germain</u>, 824 F.3d at 272.  The court's description of the "general features" should focus on "direct and immediate cause of the injuries suffered, rather than the alleged negligence underlying the suit."  <u>Tandon</u>, 752 F.3d at 249.  "After

defining the general type of incident giving rise to the tort, the court next asks 'whether [that] incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping.'" Great Lakes Ins. SE v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, No. 19 Civ. 10656 (RA), 2020 WL 4547218, at *10 (S.D.N.Y. Aug. 6, 2020) (quoting Grubart, 513 U.S. at 539). Courts must be mindful that "[n]ot all torts that happen on or over navigable water have the potential to disrupt commercial shipping. Otherwise, there would be no need for the potential effect test at all; we could simply apply the location test in its place." Tandon, 752 F.3d at 251.

Where an individual is injured on a docked boat, the possibility of an emergency response may, in some circumstances, have the potential to disrupt maritime commerce. See, e.g., Butler v. Am. Trawler Co., Inc., 887 F.2d 20, 21 (1st Cir. 1989) (ship passenger who brought suit against wharf owner for injuries sustained while attempting to board docked ship properly invoked admiralty jurisdiction); Parker v. Malletts Bay Boat Club, Inc., No. 5:09 Civ. 244, 2010 WL 3767295, at *1, *4 (D. Vt. Sept. 27, 2010) (plaintiff's fall while boarding a "large motor boat used to transport passengers" had potential to disrupt maritime commerce by, for example, occasioning "the response of emergency personnel whose presence and activities, in turn, may have impeded the passage of other vessels and the access of both vessels and passengers to the dock"). "[A]t least three circuits have relied on the potentially disruptive effect of a maritime emergency response to sustain admiralty jurisdiction, even when the activity or vessels at issue were recreational." Germain, 824 F.3d at 274 (citing In re Mission Bay Jet Sports, LLC, 570 F.3d 1124, 1129-30 (9th Cir. 2009); Ayers v. United States, 277 F.3d 821, 827-28 (6th Cir. 2002); and Sinclair v. Soniform, Inc., 935 F.2d 599, 602 (3d Cir. 1991)).

"This 'potential rescue' effect has in some cases supported a finding of admiralty jurisdiction." Ficarra v. Germain, 91 F. Supp. 3d 309, 315 (N.D.N.Y. 2015), rev'd on other grounds, 824 F.3d 258 (citing Roane v. Greenwich Swim Comm., 330 F. Supp. 2d 306, 314 (S.D.N.Y. 2004), and Szollosy v. Hyatt Corp., 208 F. Supp. 2d 205, 212 (D. Conn. 2002)). "However, those cases typically involve rescue at sea or far from shore where the potential risk of an emergency response to snarl commercial shipping traffic is more realistic." Id.

The Second Circuit has taken a limited view of scenarios in which a possible emergency response could conceivably affect maritime commerce under the Grubart test. See Germain, 824 F.3d at 258; Tandon, 752 F.3d at 250. In Tandon, the Court held that "a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water . . . presents no realistic threat to maritime commerce." Tandon, 752 F.3d at 250. The Court held that when an incident requiring an emergency response "takes place on a vessel or in open water far from the shore, the potential danger to commercial shipping posed by a maritime emergency response may be more significant" than where a rescue operation is required at a dock. Id. at 252. The Court elaborated,

> [t]he risks to maritime commerce posed by a rescue operation at a dock are substantially lower than the risks to maritime commerce posed by a rescue operation at sea. Emergency responders may have to travel by boat to reach persons injured near a permanent dock, but they will never have to travel far. And once the emergency responders arrive at the scene, they can moor their vessel at the permanent dock, rather than having to focus simultaneously on navigating their vessel and rescuing the injured. An emergency response to an incident on and around a floating dock is consequently much less likely to "ensnarl maritime traffic" than an emergency response to an incident on a vessel or an incident in open water.

Id. at 252 (internal citation omitted). In Germain, the Second Circuit expanded on Tandon's conclusion that a rescue in open water is more likely to disrupt maritime commerce than a rescue at a floating dock. See Germain, 824 F.3d at 273. The Germain Court distinguished Tandon,

9

because the incident in <u>Germain</u> occurred in open navigable waters, reasoning that "rescue of passengers injured on a vessel on open navigable waters will often come not from shore, dock, or docked vessels but from other vessels on those same navigable waters." <u>Id.</u> at 273.

      **c.  The Bar On Contribution And Indemnification Claims Between Settling And Nonsettling Parties In Maritime Cases**

            **i.  Contribution And Indemnification Between Joint Tortfeasors**

Joint tortfeasors are "[t]wo or more tortfeasors who contributed to the claimant's injury and who may be joined as defendants in the same lawsuit."  Black's Law Dictionary (11th ed. 2019).  In admiralty, "a joint tortfeasor who pays more than its apportioned share of an injured party's damages may generally seek contribution from the other tortfeasors." <u>Matter of Energetic Tank, Inc.</u>, No. 18 Civ. 1359 (PAC) (RWL), 2022 WL 7059134, at *2 (S.D.N.Y. Oct. 12, 2022).[6]

"Contribution is available 'whether or not the culpable parties are allegedly liable for the injury under the same or different theories.'" <u>Barbagallo v. Marcum LLP</u>, No. 11 Civ. 1358 (JBW), 2012 WL 1664238, at *11 (E.D.N.Y. May 11, 2012) (quoting <u>Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp.</u>, 523 N.E.2d 803, 805 (N.Y.1988)); <u>see Graham-Johnson v. City of Albany</u>, No. 19 Civ. 1274 (BKS) (CFH), 2021 WL 1614763, at *5 (N.D.N.Y. Apr. 26, 2021) ("contribution generally operates to apportion liability among tort-feasors, regardless of the underlying theory of liability").  "For a contribution claim to succeed, the joint tortfeasors must have contributed to the same injury." <u>Thar Process</u>, 2023 WL 24049, at *8.

---

[6] Likewise, "[u]nder New York law, 'two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought.'" <u>Thar Process, Inc. v. Sound Wellness, LLC</u>, No. 21 Civ. 422S (WMS), 2023 WL 24049, at *7 (W.D.N.Y. Jan. 3, 2023).

"In contrast to contribution, indemnification shifts the entire loss from one party to another." In re M/V MSC FLAMINIA, 339 F. Supp. 3d 185, 244 (S.D.N.Y. 2018). "In admiralty cases, indemnification may be based on tort, contract, or the relationship of the parties ('Ryan indemnity')." Id. (citing Schoenbaum, Admiralty & Maritime Law § 5-19).

"Codefendant cross-claims for indemnity and contribution are liabilities that must be addressed in order to protect the shipowner's rights under the Limitation Act." Odeco Oil & Gas Co., Drilling Div. v. Bonnette, 74 F.3d 671, 675 (5th Cir. 1996). "Therefore, parties seeking indemnification and contribution from a shipowner must be considered claimants within the meaning of the Limitation Act." Id. Where third-party or cross claims are asserted in the context of a limitation of liability proceeding, the parties still stand "on the same side of the main litigation." See In re Queeny/Corinthos, 503 F. Supp. 361, 364 (E.D. Pa. 1980).

### ii.  The Proportionate Share Rule

#### a.  **McDermott**

In McDermott, Inc. v. Amclyde, 511 U.S. 202 (1994), and Boca Grande Club v. Fla. Power & Light Co., 511 U.S. 222 (1994), "the Supreme Court established a proportionate liability scheme and barred contribution actions by nonsettling tortfeasors against settling tortfeasors." In re Essence Marine Holdings Ltd., No. 06 Civ. 8154 (LBS), 2009 WL 1564129, at *3 (S.D.N.Y. June 4, 2009).  In McDermott, the Supreme Court "considered how a settlement with less than all of the defendants in an admiralty case should affect the liability of nonsettling defendants." McDermott, 511 U.S. at 207.  The Court took instruction from its prior decision in United States v. Reliable Transfer Co., 421 U.S. 397 (1975). There, the Court abandoned the "divided damages" rule, which required equal division of property damage between tortfeasors regardless of each tortfeasor's proportion of fault, and, instead, held that "liability for such

11

damage is to be allocated among the parties proportionately to the comparative degree of their fault." Reliable Transfer, 421 U.S. at 411.

The McDermott Court considered three different approaches for determining the credit nonsettling tortfeasors should receive upon another tortfeasor's settlement. McDermott, 511 U.S. at 208–09. The Court adopted the "proportionate share" approach based on its consistency with Reliable Transfer and its promotion of settlement and judicial economy. Id. at 211. Under that approach, the nonsettling tortfeasor would receive a "credit for the settling defendants' 'proportionate share' of responsibility for the total obligation." Id. at 209. "[N]o suits for contribution from the settling defendants are permitted, nor are they necessary, because the nonsettling defendants pay no more than their share of the judgment." Id.

### b. Boca Grande

The same day it issued its McDermott decision, the Supreme Court issued its decision in Boca Grande. In that case, a sailboat collided with a power line owned and maintained by Florida Power and Light Company, Inc. ("FP&L"), killing the sailboat's two passengers, who had rented the sailboat from Boca Grande Club. Joint Appendix, Boca Grande Club, Inc. v. Florida Power & Light Co., Inc., 511 U.S. 222 (1994) (No. 93-180) at 88.[7] The decedents' estate sued FP&L in state court, and FP&L brought a third-party claim for contribution against Boca Grande. Id. Boca Grande initiated a limitation of liability action in federal district court. Id. The decedents, FP&L and other defendants brought claims against Boca Grande in the limitation action. Id. at 74. The district court issued an injunction staying further prosecution of the state

---

[7] The Boca Grande Joint Appendix is available via ProQuest Supreme Court Insight, supremecourt.proquest.com.

court action.  Id. at 46.  Boca Grande filed a motion for summary judgment as to all claims pending in the limitation case.  Id. at 51–62.

During the pendency of the limitation action, Boca Grande settled with the decedents' estates.  Id. at 88.  Boca Grande and the settling claimants filed a stipulation and joint motion seeking dismissal with prejudice of all settling claimants' claims against Boca Grande in the limitation action and in the pending state court action.  Id. at 40.  The stipulation and joint motion sought a stay of the limitation proceeding until the state court action was concluded or the limitation proceeding was terminated upon Boca Grande's anticipated motion for summary judgment on the remaining claims.  Id.  The moving parties argued that

> [e]ven assuming for the purpose of the motion to stay that there may be viable claims for indemnity or contribution at some time in the future it is obvious that such claims can not be quantified until the state proceeding is terminated.  There is therefore nothing for this Court to do in this limitation action after the settlement with the Stipulating Claimants is consummated until the state proceeding is completed.  That is, nothing except to address the motion for summary judgment mentioned above when it is filed by Boca Grande Club.

Id. at 41.  The stipulation and joint motion also sought to lift the injunction that the district court had previously imposed on the settling claimants' state court actions.  Id. at 41–43.  FP&L opposed on the grounds that it could not determine whether the settlement had been in good faith and that there was outstanding discovery.  Id. at 45–47.  The district court granted the motion.  The court, inter alia, dismissed the settling claimants' claims against Boca Grande with prejudice; stayed further prosecution of the limitation action until termination of the state court lawsuits, with the exception that Boca Grande was permitted to file motions for summary judgment as to FP&L and the boat manufacturer's contribution and indemnification claims; and lifted the injunction as to each of the settling claimants, allowing them to pursue whatever actions they may have against parties other than Boca Grande.  Id. at 49–50.

Boca Grande then filed a motion for summary judgment seeking dismissal of FP&L's contribution and indemnity claims on the ground that they were barred by the settlement.  Id. at 51–62.  The district court granted the motion, holding that Boca Grande's settlement with the decedents constituted an absolute bar to FP&L's claim for contribution.  Id. at 89.  The Eleventh Circuit reversed, based on its decision in Great Lakes Dredge & Dock Co. v. Miller, 957 F.2d 1575, 1576 (11th Cir. 1992), which held that, "under maritime law, a tortfeasor is not precluded from seeking contribution from a joint tortfeasor who has settled."  In re Complaint of Boca Grande Club, 990 F.2d 606, 607 (11th Cir. 1993).

The Supreme Court granted certiorari "to consider the question whether, in an action against several alleged joint tortfeasors under general maritime law, the plaintiff's settlement with one defendant bars a claim for contribution brought by nonsettling defendants against the settling defendant."  Boca Grande, 511 U.S. at 222–23.  The Court answered the question in the affirmative, based on the opinion announced that same day in McDermott, which adopted the "proportionate share rule, under which actions for contribution against settling defendants are neither necessary nor permitted."  Id. at 223.  The Court vacated the Eleventh Circuit's judgment and remanded "for further proceedings consistent with that opinion."  Id.  On remand, the Eleventh Circuit held that FP&L "may not pursue its claim for contribution" against Boca Grande, and affirmed the district court's grant of summary judgment.  Boca Grande Club v. Polackwich, 25 F.3d 974, 974 (11th Cir. 1994).

### c.  Progeny Of **Boca Grande** And **McDermott**

Following Boca Grande and McDermott, courts have applied the proportionate share rule to contribution claims in limitation of liability actions.  See, e.g., In re Lasala, 543 F. Supp. 3d 381, 388 (E.D. La. 2021) (granting summary judgment and dismissing contribution claim

14

asserted by settling party against non-settling party); In re Holly Marine Towing, Inc., No. 00-C-4750 (MFK), 2003 WL 21384639, at *6 (N.D. Ill. June 16, 2003) ("the Court agrees with Holly that under McDermott v. AmClyde, the settlement of the plaintiffs' claims against Holly extinguishes the claim by Baker and JLG against Holly (which essentially amount to contribution claims); Baker and JLG will be entitled to a credit, equal to the percentage of Holly's fault, against any eventual judgment in the plaintiffs' favor"); In re Merichem Co., No. 94-2697, 1997 WL 472509, at *2 (E.D. La. Aug. 15, 1997) ("As a non-settling tortfeasor, Fryoux has no right to contribution from Merichem, a settling tortfeasor.").

Courts have also applied the proportionate share rule to tort indemnification claims. Following Reliable Transfer, "tort indemnity has been 'limited to cases where a non-negligent or vicariously liable tortfeasor is entitled to indemnity from a person who is guilty of actual fault.'" In re M/V MSC FLAMINIA, 339 F. Supp. 3d at 245 (quoting Schoenbaum, Admiralty & Maritime Law § 5-19). Following McDermott, the proportionate share rule bars a non-settling party's claims for tort-based indemnification against settling party. See In re M/V DG HARMONY, 436 F. Supp. 2d 660, 667 (S.D.N.Y. 2006) (holding that the settling party "cannot be liable -- on a tort indemnity theory -- for more than [their] liability as determined at the trial"); In re J.A.R. Barge Lines, L.P., No. 03-163, 2005 WL 642700, at *2 (W.D. Pa. Feb. 17, 2005) ("McDermott and Boca Grande control this dispute and dictate that the . . . contribution and indemnification action against plaintiffs is neither necessary nor permitted now that plaintiffs and Smith have reached a settlement."). "Although parties to a contract can alter the rule set forth in [McDermott]," In re M/V DG HARMONY, 436 F. Supp. at 670, in an admiralty case, "contractual indemnity is unavailable when there is no express indemnification agreement." Foss Mar. Co. v. Corvus Energy Ltd., 878 F.3d 1144, 1145 (9th Cir. 2017).

## III. Analysis

### a.  This Court Does Not Have Admiralty Jurisdiction In This Matter

In opposing summary judgment, Town & Country argues that "[n]either this Court nor the state court has made a determination as to what substantive law will apply to the facts this case," and that, therefore, application of <u>McDermott</u> and <u>Boca Grande</u> is inappropriate.  Town & Country's Memorandum in Opposition, ECF No. 71 ("Town & Country Opp."), at 12.  The D'Ancona Estate responds that this Court's admiralty jurisdiction is "not on open question."  D'Ancona Estate's Reply Memorandum in Support of its Motion for Summary Judgment, ECF No. 74, at 3.  No party moved to dismiss the petition for lack of admiralty jurisdiction.  The Court reviewed the subject matter jurisdiction question and requested the parties' submissions on this issue.  <u>See</u> ECF Nos. 75, 76.  In its supplemental brief, Town & Country argues that this Court lacks admiralty jurisdiction over this proceeding under <u>Grubart</u> and <u>Tandon</u>.  <u>See</u> ECF No. 75.  The D'Ancona Estate argues that that this Court has admiralty jurisdiction.  <u>See</u> ECF No. 76.

This Court respectfully recommends that the District Court hold that it does not have admiralty jurisdiction over this limitation of liability and exoneration proceeding and dismiss the action.  The Court applies <u>Grubart</u> and <u>Tandon</u> to come to this conclusion.  The proposed basis for admiralty jurisdiction is that, at the time that the decedents were fatally exposed to carbon monoxide, they were on board the Vessel, which was docked overnight at a rented boat slip adjacent to the bar/restaurant "Cherry's On The Bay."  <u>See</u> Town & Country Claim and Answer, ECF No. 41 ¶ 2.  On these facts, <u>Grubart</u>'s location test is satisfied.  <u>See</u> Sisson v. Ruby, 497 U.S. 358, 367 (1990) (vessel docked on navigable waters satisfies the location test).  The connection test, however, is only partially satisfied.  The second part of the connection test is satisfied, because the alleged tortfeasors here were engaged in activities "substantially related to

16

traditional maritime activity," and such activities are claimed to have been proximate causes of the incident. Grubart, 513 U.S at 541. D'Ancona's "alleged wrongdoing" was the "mooring of the boat at a slip on Fire Island for overnight stay, [] decision to operate a gas generator all night while onboard, and [] disabling of the carbon monoxide alarms." Town & Country Opp. at 10. These activities are substantially related to maritime activities under the Supreme Court precedent. See Sisson, 497 U.S. at 367 (1990) ("Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to 'traditional maritime activity' given the broad perspective demanded by the second aspect of the test.").

The first part of the connection test is not satisfied because the incident did not have the potential to disrupt maritime commerce under Grubart. To apply the connection test, a court must first assess the "general features of the incident involved," Grubart, 513 U.S. at 534, focusing on the "direct and immediate cause of the injuries suffered." Tandon, 752 F.3d at 249. In making this assessment, this Court finds that the incident is accurately characterized at an intermediate level of generality, see Grubart, 513 U.S. at 538, as carbon monoxide poisoning of overnight passengers on a recreational vessel docked at a boat slip adjacent to land. See D'Ancona Local Civil Rule 56.1 Statement of Material Facts ("D'Ancona 56.1") ¶¶ 3–4. The Vessel was docked overnight, and its passengers—who were presumably sleeping—were not in the course of travel when they were exposed to carbon monoxide. See Town & Country Claim and Answer, ECF No. 41 ¶ 2. The incident did not have the potential to "create any obstruction to the free passage of commercial ships along navigable waterways" or "lead to a disruption in the course of the waterway." See Tandon, 752 F.3d at 249. This incident is unlike the incident in Germain, which the court described as "injury to a passenger who jumped from a vessel on open navigable waters." Germain, 824 F.3d at 273. As the Germain Court held, an "incident on

open navigable waters" creates the potential for the "crew of a vessel . . . [to] become distracted," risking "collision with a commercial vessel." Germain, 824 F.3d at 273. By contrast, a "rescue at or near a dock" does not create the potential for a collision involving a commercial vessel. Id.

The incident here did not have the potential to "immediately damage nearby commercial vessels." See Tandon, 752 F.3d at 249. Unlike in Sisson, where the Supreme Court held that a fire on a vessel could disrupt maritime commerce if it "spread to nearby commercial vessels," or rendered a marina "inaccessible to [commercial] vessels," a carbon monoxide leak from an "electrical generator aboard the [Vessel]," see D'Ancona Supplemental Brief (ECF No. 76) at 1, would not pose a similar threat. See Sisson, 497 U.S. at 362 (1990); see also H2O Houseboat Vacations v. Hernandez, 103 F.3d 914, 916 (9th Cir. 1996) (distinguishing Sisson and finding that a carbon monoxide leak "was dangerous only because it was contained in the sleeping area of the houseboat. The fumes would not be dangerous if they escaped."). For similar reasons, the carbon monoxide leak here posed a danger only to the Vessel's overnight passengers, not "those who are employed in maritime commerce." See Tandon, 752 F.3d at 250.

Although the incident had the potential to occasion the response of emergency medical personnel, or at least police personnel once the event's consequences were known, the occurrence at dock adjacent to land minimized the potential disruptiveness of an emergency response. See D'Ancona 56.1 ¶ 3. Like the incident in Tandon, the incident here occurred in close proximity to "a permanent dock surrounded by navigable water," presenting "no realistic threat to maritime commerce." Tandon, 752 F.3d at 250. Emergency responders could access

18

the Vessel via land.[8]  Even if police investigators or other responders were to arrive by water, see D'Ancona Supplemental Brief at 1, the impact on the flow of commercial maritime traffic would be minimal.  The responders could secure their boats to the dock or anchor close to land, out of the way of traveling commercial vessels.  Unlike in Germain, the incident did not occur on "open navigable waters" or "far from shore" where traffic of commercial vessels could be disrupted.  See Tandon, 752 F.3d at 252; Germain, 824 F.3d at 273.  An emergency response would therefore have had a minimal impact on maritime commerce, if any.  That the Vessel was towed "across the bay" after the police conducted their initial investigation aboard the Vessel does not change this conclusion.  See D'Ancona Supplemental Brief at 1.  If it did, nearly any incident leading to subsequent transportation across navigable waters would satisfy the "maritime commerce" prong of the Grubart test.

The D'Ancona Estate characterizes the incident as a "fatal machinery malfunction aboard a vessel berthed at a commercial wharf" and argues that such an incident had the potential to disrupt maritime commerce.  D'Ancona Supplemental Brief at 3.  It relies on Burke v. Quick Lift, Inc., 464 F. Supp. 2d 150, 154 (E.D.N.Y. 2006), in which the plaintiff was injured when a hydraulic davit—a mechanical device used to lift small boats onto the plaintiff's yacht— malfunctioned.  The Burke Court found that the incident had the potential to disrupt maritime commerce because the mechanical failure of the davit presented a potential hazard to nearby boats and because a potential rescue operation could disrupt commercial traffic.  Id. at 156.

---

[8] It so happens that Cherry's On The Bay is located less than 500 feet from both the Cherry Grove Fire Department and Cherry Grove EMS.  See https://cgfd.org/ (last visited Jan. 24, 2023); Google Maps – Cherry Grove EMS, https://goo.gl/maps/h7bkws6zr6GxACeF9 (last visited Jan. 24, 2023).  Although that fact is not determinative here, it suggests that a medical emergency at or near Cherry's On The Bay could occasion a land-based initial response.

As an initial matter, the D'Ancona Estate's general description of the incident is too broad.  Describing the incident as arising from a "machinery malfunction" is not sufficiently focused on the "direct and immediate cause of the injuries suffered," which here was a carbon monoxide leak from an on-board generator.  See Sgambati Complaint ¶¶ 28–29; Tandon, 752 F.3d at 249.  Burke, which involved a "machinery malfunction," pre-dates Tandon and Germain, and is distinguishable from the present case.  Although the failure of hydraulic machinery used to lift a watercraft could damage nearby boats, the same is not true of a carbon monoxide leak that poisoned a boat's overnight passengers.  The D'Ancona Estate argues that a carbon monoxide leak could "poison or kill other mariners nearby" or "become explosive."  D'Ancona Supplemental Brief at 4.  But here, there are no facts or allegations suggesting that the carbon monoxide posed a danger to anyone outside of the Vessel or that the carbon monoxide was explosive.  In addition, the D'Ancona Estate's description of the dock as a "commercial wharf" is imprecise, as it is undisputed that the dock here was adjacent to a bar/restaurant and was visited by recreational boaters like D'Ancona.

The D'Ancona Estate's reliance on cases in other circuits involving carbon monoxide poisoning is also unavailing, as the underlying facts in those cases are distinguishable.  See In re Houseboat STARSHIP II, No. 2:05-0086, 2005 WL 3440788, at *2 (M.D. Tenn. Dec. 12, 2005) (involving a vessel "in the course of a waterway trip and actually tied to an island"); In re SkipperLiner Indus., Inc., No. 00-C-0730-C, 2002 WL 32348827, at *8 (W.D. Wis. Jan. 31, 2002) (involving a "vessel anchored to an island in a navigable river"); Beckett v. MasterCraft Boat Co., 126 Cal. App. 4th 1045, 1049, 24 Cal. Rptr. 3d 490, 491 (4th Dist. Ct. App. 2005) (involving "carbon monoxide poisoning while riding in a 1988 Mastercraft boat on the Rio Hardy River" and containing no discussion of the Grubart test or disruption of maritime

commerce).  Although the D'Ancona Estate cites <u>Matter of Abraham Peute for Exoneration from or Limitation of Liab.</u>, No. 2:18 Civ. 73 (JVB), 2018 WL 3548833, at *2 (N.D. Ind. July 23, 2018), for the general proposition that an emergency response to a dock has the potential to disrupt maritime commerce, this Court is persuaded by <u>Tandon</u> and <u>Germain</u>, which, when applied to the facts here, compel the opposite conclusion.

Therefore, because the underlying facts do not satisfy <u>Grubart</u>'s connection test, this Court respectfully recommends finding that the Court lacks admiralty jurisdiction over this action, that the action be dismissed, and the stay entered at ECF No. 38 be dissolved.

### b.  If Admiralty Jurisdiction Exists, Town & Country's Contribution Claim Fails Under Maritime Law

If the District Court finds that it has admiralty jurisdiction in this case, this Court respectfully recommends that the District Court find that maritime law applies to Town & Country's contribution claim; find that the contribution claim is barred under <u>McDermott</u> and <u>Boca Grande</u>; and grant the motion for summary judgment in the D'Ancona Estate's favor as to the contribution claim.

D'Ancona and Town & Country are "alleged joint tortfeasors."  <u>See</u> Black's Law Dictionary (11th ed. 2019); <u>Boca Grande</u>, 511 U.S. at 222-23 (power line owner and sailboat owner are "alleged joint tortfeasors" in sailboat owner's limitation action arising from collision between the sailboat and power line, although alleged wrongs occurred separately, namely in locating/operating a power line where it could affect boats and in rental of boat with outdated safety mechanism, namely a mast that could conduct electricity.  <u>See</u> Joint Appendix, <u>Boca Grande Club, Inc. v. Florida Power & Light Co., Inc.</u>, 511 U.S. 222 (1994) (No. 93-180) at 83). The complaint in the Sgambati Action, from which Town & Country's contribution and

indemnification claims arise, alleges that D'Ancona and Town & Country's negligent acts jointly caused Sgambati's death.  See generally Sgambati Complaint.

As alleged joint tortfeasors, D'Ancona and Town & Country are subject to the proportionate share rule under McDermott and Boca Grande.  Under the proportionate share rule, because the D'Ancona Estate settled with the Sgambati Estate, in the event there is a judgment against Town & Country, Town & Country will receive a "credit for the settling defendants' 'proportionate share' of responsibility for the total obligation."  McDermott, 511 U.S. at 209. Town & Country's contribution claim in this action is barred.  Id.; Boca Grande, 511 U.S. at 222-23.

Town & Country argues that D'Ancona and Town & Country are not joint tortfeasors for two reasons, such that McDermott and Boca Grande do not control.  First, it argues that that, because the D'Ancona Estate and Town & Country are not co-defendants in this limitation and exoneration action, as they are in the Sgambati Action, they cannot be considered joint tortfeasors for the purposes of the D'Ancona Estate's motion for summary judgment.  Town & Country Opp. at 4–5.  In other words, it argues that, because the D'Ancona Estate in this action is in the position of a plaintiff by virtue of having commenced this action, and Town & Country is in the position of a claimant, the joint-tortfeasor relationship "ceases to exist."  Town & Country Opp. at 5.  The Court disagrees.  Although it is true that the D'Ancona Estate and Town & Country are on opposite "sides" in the limitation and exoneration action, they remain on the same side of the litigation from which this action arises.  See Queeny, 503 F. Supp. at 364 ("Queeny is a petitioner for limitation of liability in the admiralty action; the products defendants are third party defendants in that action.  To be on the same side of the litigation these parties need not have an identity of interests, issues or positions with respect to each other, but need

only stand in a similar posture in relation to claims of opposing parties brought against each of them.").  Their relationship remains as parties mutually opposing the Sgambati Estate's effort to attribute liability to each and to collect damages for the same injury, namely the decedent's death.

Town & Country next argues that D'Ancona and Town & Country are not joint tortfeasors because "the underlying allegations against them concern (alleged) separate and distinct acts."  Town & Country Opp. at 8–9.  Town & Country relies on Westinghouse Credit Corp. v. M/V New Orleans, 39 F.3d 553 (5th Cir. 1994), in which the court found that the parties were not joint tortfeasors because they committed "two separate torts resulting in two different harms – one occurring over a period of two days as a result of negligent towage of the vessel and one occurring over a subsequent period of one year as a result of negligence in the care and custody of the vessel during storage."  Westinghouse, 39 F.3d at 555.  This case is unlike Westinghouse, and is more like Boca Grande, supra, II(c)(ii)(b).  Here, even assuming Sgambati's theories of liability are different as to D'Ancona and Town & Country, the alleged harm caused—Sgambati's death—is the same.  See Sgambati Complaint ¶ 52.  Therefore, D'Ancona and Town & Country are alleged joint tortfeasors subject to McDermott and Boca Grande.

### c.  If Admiralty Jurisdiction Exists, Town & Country's Indemnification Claim Fails Under Maritime Law

If the District Court finds that it has admiralty jurisdiction and that maritime law applies to Town & Country's claims, this Court respectfully recommends that the District Court grant summary judgment in the D'Ancona Estate's favor and deny Town & Country's indemnification claim.  Town & Country's Claim and Answer in this action states that it seeks "common law indemnification and/or contractual indemnification" from the D'Ancona Estate "for all or any

verdicts or judgment that plaintiff in the Sgambati Action may recover against [Town & Country] for [D'Ancona's] actual negligence." See ECF No. 41 at 4. For the reasons discussed, supra, II(c)(ii)(c), any claim in this action for common law tort indemnification is barred due to the D'Ancona Estate's settlement with the Sgambati Estate. See In re M/V DG HARMONY, 436 F. Supp. 2d at 667. Although the claim also seeks contractual indemnification, Town & Country's opposition does not identify an express indemnification agreement to demonstrate that the claim would fall outside the scope of McDermott. See id. at 670. In fact, the opposition makes no mention of the contractual indemnity claim, so that abandonment alone warrants granting summary judgment as to that claim. See Marache v. Akzo Nobel Coatings, Inc., No. 08-11049 (SHS) (AJP), 2010 WL 908467, at *15 (S.D.N.Y. Mar. 12, 2010) (finding claim abandoned by virtue of plaintiff's failure to address it in opposition to defendant's summary judgment motion); Taylor v. City of N.Y., 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

## IV.    Conclusion

For the foregoing reasons, this Court respectfully recommends that the District Court find that it does not have admiralty jurisdiction over this case, dismiss the petition, and dissolve the stay entered at ECF No. 38. If the District Court finds that it does have admiralty jurisdiction, this Court respectfully recommends that the District Court grant the D'Ancona Estate's motion for summary judgment and deny Town & Country's claims for contribution and indemnification.[9]

---

[9] If the District Court finds that it has admiralty jurisdiction and grants the motion for summary judgment in its entirety, this Court respectfully recommends that the parties be ordered to file a joint letter within 15 days of the District Court's Order, stating their respective positions as to whether there is any reason why this case should not be closed.

This Report and Recommendation does not suggest that the District Court's determination in this action has preclusive effect on any claim or theory of liability that the parties wish to assert in state court or on the state court's determination or application of substantive law.

Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the District Judge prior to the expiration of the fourteen-day period for filing objections. Failure to file objections within fourteen days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. See Miller v. Brightstar Asia, Ltd., 43 F.4th 112, 120 (2d Cir. 2022) (stating that, "although Rule 72 applies only to the district court's review of a report and recommendation, this court has adopted the rule that when a party fails to object timely to a magistrate's recommended decision, it waives any right to further review of that decision") (internal citation & quotations omitted).

Dated: Brooklyn, New York
       January 30, 2023

*Vera M. Scanlon*
VERA M. SCANLON
United States Magistrate Judge