```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

In the Matter of the Complaint of

MICHELE A. D'ANCONA, as Executrix          MEMORANDUM & ORDER
of the Estate of Peter Rocco               19-CV-5492(EK)(VMS)
D'Ancona and Talkin' Trash, bearing
NY 7257 CY,

For exoneration from or limitation
of liability.[1]

------------------------------------x
```

ERIC KOMITEE, United States District Judge:

        The Court has received Magistrate Judge Scanlon's comprehensive Report and Recommendation (R&R) dated January 1, 2023.  ECF No. 77.  Judge Scanlon recommends that I dismiss this case for lack of admiralty jurisdiction under 28 U.S.C. § 1333 and dissolve the stay entered at ECF No. 38.  Plaintiff timely objected, contending that the Court does have admiralty jurisdiction because the facts of this case satisfy the test laid out by the Supreme Court in *Jerome B. Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).  Pl. Objs. 4, 7-17, ECF No. 78.

        For the reasons set forth below, I adopt the R&R's recommendation to dismiss this case for lack of admiralty jurisdiction.  Given that conclusion, I do not reach Judge

---

[1] The Clerk of Court is respectfully directed to amend the caption as set forth above.

Scanlon's alternative recommendation that I grant summary judgment in favor of the D'Ancona estate on the contribution claim.

## I.  Legal Standard

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  The district court generally reviews *de novo* those portions of an R&R to which a party has specifically objected.  *Id.*; Fed. R. Civ. P. 72(b)(3); *see also Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) ("A proper objection is one that identifies the specific portions of the R&R that the objector asserts are erroneous and provides a basis for this assertion."), aff'd, 578 F. App'x 51 (2d Cir. 2014).

## II.  Discussion

Plaintiff's objection to Judge Scanlon's jurisdictional recommendation is focused on one aspect of the admiralty jurisdiction analysis.  Under *Grubart*, courts apply both a "location test" and a two-part "connection test."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 247 (2d Cir. 2014) (citing *Grubart*, 513 U.S. at 534-43).  Plaintiff objects to Magistrate Judge Scanlon's conclusions with regard the first prong of the connection test.  Pls. Objs. at 7, ECF 78.

That first prong requires courts to "assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce." *Grubart*, 513 U.S. at 534 (cleaned up). If the type of incident – examined "at an intermediate level of possible generality" – poses "more than a fanciful risk to commercial shipping," then the first prong of the connection test is satisfied. *Id*. at 538-39. Examining an incident at an "intermediate level of possible generality" simply means that a court should not look to whether this particular incident actually caused disruptions, but should instead aim to capture the possible effects of similar incidents. *See Sisson v. Ruby*, 497 U.S. 358, 363 (1990).

Consequently, the relevant inquiry is not whether this particular carbon monoxide leak disrupted maritime commerce, but instead whether carbon monoxide leaks *like this one* are "likely" to cause such disruptions. *See Sisson*, 497 U.S. at 365 (courts should assess whether "such an incident is likely to disrupt commercial activity").

At an intermediate level of generality, this incident is properly understood as a carbon monoxide poisoning of overnight passengers on a recreational vessel docked at a boat slip adjacent to land. (The R&R correctly adopts this framing. ECF 77, at 17.) That type of incident does not pose "more than

a fanciful risk to commercial shipping," *Grubart*, 513 U.S. at 539, because the incident is confined by its nature to the inside of a cabin, and any emergency response would have minimal impact on maritime commerce. The vessel was not on open "navigable waters" or "far from shore" where a rescue operation would disrupt commercial traffic. *Ficarra v. Germain*, 91 F. Supp. 3d 309, 315 (N.D.N.Y. 2015), *rev'd on other grounds*, 824 F.3d 258 (2d Cir. 2016). Here, both the type of incident itself and any emergency response to it are unlikely to have any impact on maritime commerce.

In *Tandon*, whose incident also took place "on and around a permanent dock," the Second Circuit explained that, for logistical reasons, "risks to maritime commerce posed by a rescue operation at a dock are substantially lower than the risks to maritime commerce posed by a rescue operation at sea." 752 F.3d at 252. Indeed, the *Tandon* court noted that even with accidents occurring *near* a permanent dock — rather than *at* such a dock, as the vessel was here — emergency responders "will never have to travel far" and "can moor their vessel at the permanent dock" rather than navigating in open water. *Id.* The responders are thus "much less likely to ensnarl maritime traffic." *Id.* In such cases, the connection test is not satisfied.

4

Plaintiff objects to this reasoning on two grounds. Her primary objection is that the R&R's description of the incident over-particularizes it in contravention of the Second Circuit's decision in *Tandon*. Pls. Objs. at 9; *Tandon*, 752 F.3d at 247. Secondarily, Plaintiff suggests in a footnote that even under the R&R's description, the carbon monoxide leak carries the risk of disrupting maritime commerce because "a heavy concentration of CO gas has the potential to explode." Pls. Objs. at 12 n.7. Neither argument is persuasive.

Plaintiff argues that to focus on the carbon monoxide leak rather than moving to a broader level of generality ignores the Second Circuit's guidance in *Tandon*. Pls. Objs. at 9. *Tandon* advises that descriptions in the *Grubart* analysis should be "neither too general to distinguish different cases nor too specific to the unique facts of the particular case." 752 F.3d at 247. The Second Circuit described the *Tandon* incident as "a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water." *Id*. at 249. That description was suitable because it "accurately captures the nature of the event giving rise to [the] suit, and the type of risks that the incident could pose to maritime commerce." *Id*.

This authority militates against Plaintiff's objection. Plaintiff's recommended description would omit any

5

mention of carbon monoxide and instead ask whether "a fatal machinery malfunction aboard a vessel at a commercial wharf" carries the potential to disrupt maritime commerce. Pls. Objs. at 10. But the phrase "machinery malfunction" is surely "too general to distinguish different cases" or capture "the type of risks that the incident could pose." *Tandon*, 752 F.3d at 247, 249.

Focusing on the nature of the machinery malfunction and the phenomenon that here constituted the disruptive risk – a carbon monoxide leak – allows the description to capture accurately the "type of risks that the incident could pose to maritime commerce." *Id*. at 249. Different types of machinery malfunctions present different types and severity of risk. Some such risks are more likely than others to disrupt maritime commerce. In order to assess that likelihood, it is necessary to first understand how a particular incident would cause disruption. *See, e.g., Sisson*, 497 U.S. at 362-63 (focusing not on the cause of the fire but on its potential effects: specifically, how a fire at a marina likely could, in other circumstances, disrupt maritime commerce by spreading to nearby commercial vessels). A description that ignores the mechanism of harm – here, the risk of carbon monoxide poisoning – is ill-suited to the analysis required by *Grubart* and *Tandon*.

6

On Plaintiff's second objection, made only in Footnote 7, Plaintiff has not carried its burden of showing that the possibility of a carbon-monoxide explosion gives rise to a sufficient likelihood that maritime commerce could be disrupted. At this stage, the party invoking jurisdiction must set forth specific facts, by "affidavits and supporting materials," sufficient to establish the court's jurisdiction. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (Sotomayor, J.); *see also London v. Polishook*, 189 F.3d 196, 199 (2d Cir. 1999) ("[W]hen a bona fide dispute is raised as to the presence of federal jurisdiction it is the affirmative burden of the party invoking such jurisdiction . . . to proffer the necessary factual predicate—not simply an allegation in a complaint—to support jurisdiction."). And Plaintiff has failed to point to any record evidence sufficient to establish that this type of carbon monoxide leak is *likely* to disrupt maritime commerce because of its "potential to explode" at high concentrations. ECF 78 at 12 n.7.

Here, all that Plaintiffs have averred — let alone adduced in discovery — is that the carbon monoxide concentration inside the vessel was high enough that "Mr. D'Ancona and Clemendina Sgambati both died as a result" of it. ECF 69, ¶ 4. ("Plaintiff's Rule 56.1 Statement"). Nothing in the summary judgment record indicates (a) the concentration of carbon

7

monoxide inside the cabin, (b) how long Mr. D'Ancona and Ms. Sgambati were inside the cabin while carbon monoxide leaked into it, (c) the concentration at which carbon monoxide becomes dangerous to breathe and for what length of time, or, crucially, (d) the concentration at which carbon monoxide begins to carry any real explosive potential.

Thus, *as the record stands*, Plaintiff has failed to suggest anything "more than a fanciful risk," *Grubart*, 513 U.S. at 539, that an incident of this type could cause an explosion. Plaintiff has adduced literally nothing in this regard. And if anything, the scientific consensus — of which the Court may take judicial notice — is to the contrary. The dangers of carbon monoxide change vary substantially depending on its concentration and the length of exposure. *See* United States Consumer Product Safety Commission: Carbon-Monoxide-Questions-and-Answers, https://www.cpsc.gov/Safety-Education/Safety-Education-Centers/Carbon-Monoxide-Information-Center/Carbon-Monoxide-Questions-and-Answers (last visited Oct. 18, 2023).[2] The Plaintiff has provided nothing, even after the opportunity

---

[2] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n.11 (1993) (courts may take judicial notice of scientific "theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics"); *United States v. Jakobetz*, 955 F.2d 786, 799-800 (2d Cir. 1992) (authorizing district courts to "take judicial notice of the general acceptability of the general theory [underpinning DNA profiling and analysis] and the use of these specific techniques"); *see generally* Fed. R. Evid. 201.

to take discovery, to suggest that the vessel contained such a "heavy concentration of CO gas" that an incident like this one has the potential to cause an explosion.  ECF. 78 at 12 n.7. Among other things, the record is silent concerning carbon monoxide's lower explosive limit, not to mention any comparison between that limit and the (lower) concentration that is dangerous to humans when inhaled over the course of a night's sleep.[3]

Given the absence of any explanation – on the facts brought before this court by the Plaintiff – of how this contained leak carried the potential not just to harm the cabin's inhabitants but to disrupt surrounding maritime commerce, admiralty jurisdiction cannot vest.

### III. Conclusion

Having conducted a de novo review of the R&R, I adopt the R&R's recommendation to dismiss for lack of admiralty jurisdiction.[4]  Because the Court lacks admiralty jurisdiction over Town and Country Marina Corp. and Vic's Marina East Inc.'s

---

[3] *See also* Occupational Safety and Health Administration, *OSHA Occupational Chemical Database: Carbon Monoxide (and CO by COHb)*, https://www.osha.gov/chemicaldata/462 (last visited Nov. 2, 2023) (noting that carbon monoxide's lower explosive limit is 12.5%, or 125,000 ppm, whereas its 8-hour exposure limit ranges from 25-50 ppm; effectively, the lower explosive limit of carbon monoxide exceeds the concentration at which it becomes dangerous to inhale over the course of a night's sleep by four orders of magnitude).

[4] I have reviewed the remainder of the R&R for clear error and found none.

claims, I do not reach the merits issues discussed in Sections II.b-c of the R&R.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (a federal district court may entertain a lawsuit only when it has both the "statutory [and] constitutional power to adjudicate it").

Accordingly, this action is dismissed without prejudice for lack of admiralty jurisdiction, and the stay entered at ECF No. 38 is dissolved.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

/s Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:    November 9, 2023
          Brooklyn, New York